ROSSELL *v.* ROSSELL.

**1.** DIVORCE—PROPERTY SETTLEMENT—FRAUD.

Whether a wife was defrauded in a property settlement with her husband is to be determined in the light of their financial circumstances at the time the agreement was made rather than at the time she filed her bill for divorce two years later.

**2.** SAME—EVIDENCE—SUFFICIENCY.

Plaintiff's claim that in a property settlement with her husband which was sustained by the court on granting her a divorce on the ground of extreme cruelty, she was defrauded, *held*, not sustained by a preponderance of the evidence.

Appeal from Wayne; Goff (John H.), J. Submitted April 16, 1924. (Docket No. 92.) Decided July 24, 1924.

Bill by Alvina Rossell against Adolph Rossell for a divorce. From a decree for plaintiff regarding alimony, she appeals. Affirmed.

*George B. Murphy* (*Fritz L. Radford,* of counsel), for plaintiff.

*Frank J. Hester* (*Allan Campbell,* of counsel), for defendant.

STEERE, J. The parties to this suit were married in the city of Detroit on April 17, 1915. They came from the same section in and are natives of Russian Poland, from where plaintiff migrated to Detroit in 1911 and defendant in 1912. Until her marriage plaintiff was "doing housework" as a domestic in Detroit earning from $4.50 to $7 per week, while de-

fendant was engaged in "scraping and laying floors" and about the time they were married "went into the building game." While they appear to have superficially acquired characteristics of the "melting-pot" product, they evidently clung to mental processes, usages, mode of living, habits and diversions with which they were familiar in the land of their nativity. When they were married she had saved $300, and testified that he had $700. He claimed that his accumulations were larger. She testified that before they were married she was acquainted with the fact that he drank and at times became "stewed pretty good." One of her grievances is that after their marriage he continued that diversion past the point of being "stewed" and at times was abusively drunk.

They lived together with considerable friction, culminating at times in active hostility, for about two years when, at his instance as she claims, they agreed to separate, he dividing equally his accumulations with her, which then amounted to $4,000, and each went his or her own way. This condition continued for but a short time, when they reconciled their differences and resumed their married life. Both seem to have had the industrial instinct of acquisitiveness and thrift pertaining to many of their nationality and type. Beginning in a small way his activities in the building game developed to a degree of fair prosperity and she claims in her bill that when, in August, 1920, they again separated and made the separation settlement involved here he had acquired through their joint efforts property worth approximately $50,000. They had in the meantime assumed a more pretentious manner of living. Amongst their various acquisitions for convenience and pleasure he owned a seven-passenger Hudson touring car which figures somewhat conspicuously in the evidence. She imputes a serious part of their troubles to his entertaining certain women of doubtful morals in and with his automobile,

one of her charges against him being adultery. She admits a general knowledge of his increased prosperity but claims that in adjustment of their financial affairs when they again separated in 1920, she was misled and deceived into signing the property agreement under which she released her dower for a much less sum than she would have accepted if she had known the facts—in other words that she was defrauded into doing so. She testified that early in her married life she underwent an abortion on his initiative and they "had no children."

Her bill charges extreme cruelty and adultery. He answered in denial with a cross-bill charging her with extreme cruelty and vicious conduct toward him in their domestic relations which made life with her intolerable, one of his complaints being that she refused to join him in any mortgages upon or conveyances of his property which blocked his financing and perilously handicapped him in his business affairs. The testimony was taken in open court. After hearing the proofs and allegations of the parties at length, drawn out with much unwholesome detail, the court rendered a decree sustaining their separation agreement of 1920 and granted plaintiff a decree of divorce on the ground of extreme cruelty, with an allowance of $200 as reasonable attorney fees and $50 for expense of witnesses.

From this decree she appeals and he does not. She obtained a decree of absolute divorce as prayed for in her bill, and the only question before this court is whether her claim that she was induced to sign their separation agreement of 1920 by "fraud, deceit and misrepresentation" is sustained by a preponderance of the evidence. That issue is to be determined in the light of their financial circumstances at the time the agreement was entered into on August 3, 1920, not over two years later when she filed her bill of complaint on September 5, 1922. The rule is well

settled that a separation agreement will not be set aside on the strength of matters occurring subsequent to its execution, such as change in the financial condition of her husband.　30 C. J. p. 1969.

She received in their settlement all their furniture and household effects.　These defendant claimed were worth $3,000, which she denied.　He also deeded her improved realty, called the "Beckwith flat," subject to a mortgage.　This she sold, subject to the mortgage, for $8,700.　Her testimony to show inducing fraudulent representations is weak and much of it wide of the mark.　One of her stressed claims runs in part as follows: "He told me in the spring of 1920 he was worth $40,000 and I believed it, so I did not think I was getting enough if he was worth that much"—manifestly a harmless deception if true.　He, however, denied any such claim of affluence, and showed that while he at various times had interests in a number of pieces of property he was a heavy borrower, and claimed quite in the line of probability that if obliged to liquidate his clear assets would not exceed $5,000 at the time of their settlement.　Another fraudulent representation of which she complains is that he told her he owned apartments on Lennox avenue, while she later discovered that a Mrs. Penner owned them and says:

"When I found out that these were in Mrs. Penner's name, I thought he told me a lie and deceived me with fraud.

"Q. What was that lie?—that he owned them?

"A. That he owned them, and he told me he was going to sell them, and now I found out that Mrs. Penner owned them.

"Q. So you were deceived in your mind because he owned less property than he told you?

"A. Yes, sir."

She was by no means unsophisticated.　She had previous trouble and experience, both in a separation

settlement and, as she testifies, helping in his business projects. She well knew from personal experience, as she tells it, that he was dishonest, untruthful, dissolute, and unfaithful to her. While both parties testify recklessly it may fairly be said that reading between the lines neither one is as bad as the other asserts, but if both could be believed neither is fit to be at large. Without going into the disgusting details as to plaintiff's charges of adultery and extreme cruelty it is sufficient to say the record well supports the court's decree granting her a divorce on the grounds alleged.

After careful examination of this record with special reference to her charges of fraudulent inducement we cannot disagree with the conclusions of the trial court, who had the advantage of seeing and hearing the witnesses, that those allegations in her bill have not been sustained by a preponderance of evidence.

The decree of the court below is in harmony with the convincing weight of evidence and will stand affirmed, without costs to either party.

CLARK, C. J., and MCDONALD, BIRD, SHARPE, MOORE, FELLOWS, and WIEST, JJ., concurred.